















SMV    3/28/06    16:16

3:05-CV-02020    PURE BIOSCIENCE V. FALKEN INDUSTRIES

*19*

*RPLYOPPM.*

1 | Joel S. Seidel, SB #175275
9939 Louise Avenue
2 | Northridge, CA 91325
Tel: (818) 832-7850
3 | Fax: (818) 832-7889

4 | Attorney for Respondent

FILED

06 MAR 28  PM 3: 10

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

NUNC PRO TUNC

MAR 27 2006

5

6

7

8 |                 UNITED STATES DISTRICT COURT

9 |              SOUTHERN DISTRICT OF CALIFORNIA

FILE BY FAX

10

11 | PURE BIOSCIENCE fka Innovative            ) Case no. 05 CV 2020 L (NLS)
Medical Services, a California corporation )
12 |                                           ) FALKEN'S REPLY MEMORANDUM IN
                                            ) SUPPORT OF ITS MOTION TO
13 |                          Petitioner,     ) VACATE THE ORDER OF JANUARY
                                            ) 18, 2006 AND THE ENSUING
14 | vs.                                      ) "JUDGMENT"
                                            )
15 | Falken Industries, Ltd., a New Jersey    ) Date: March 27, 2006
corporation,                               ) Time: 10:30 a.m.
16 |                                           ) Courtroom: Fourteen
                         Respondent.        )
17 |                                           )

18

19 |        Falken, by its attorneys, submits this Reply in response to Pure's Opposition to

20 | its Motion to Vacate the Order of January 18, 2006 and the Ensuing Judgment.

21 |        As a preliminary matter, Falken argued that the Court's Order of January 18th

22 | did not constitute a judgment, as that term is used pursuant to Rule 58 of the Federal

23 | Rules of Civil Procedure.  Pure does not appear to contest this argument so that there

24 | is no judgment to vacate.  At most, the judgment of confirmation is the legal equivalent

25 | of an order of default.  However, even if the judgment confirming the award is

26 | considered a judgment for purposes of Rule 58, Rule 55(c) still provides a basis for

27 | relief.

28 |        In its opening memorandum, Falken argued that there is a strong public policy

1

1 | to have cases decided on their merits, and that as a consequence, any doubts regarding
2 | a motion to vacate a default should be resolved in favor of the party seeking relief.
3 | Falken cited <u>TCI Group Life Insurance Plan v. Knoebber</u>, 244 F.3d 691 (9th Cir. 2001)
4 | as an example of the Ninth Circuit reversing the district court's refusal to vacate the
5 | default judgment.  The Ninth Circuit made clear that the interests of justice in the
6 | better course was to vacate the default judgment so that the case could be decided on
7 | the merits.  Pure seemingly relies on <u>TCI</u> and cites it for the proposition that relief
8 | from the default judgment will not be granted "where Falken had <u>undisputed notice</u> of
9 | the action and chose not to respond as a delay tactic or for other strategic reasons."
10 | (Emphasis in the Original)  Pure Memo at 4.  However, <u>TCI</u> does not stand for that
11 | proposition.  In fact, the Ninth Circuit indicated that a litigant who receives a pleading,
12 | reads and understands it, and takes no steps to meet the deadlines for filing a
13 | responsive pleading may be neglectful, but is not culpable or inexcusable unless it was
14 | done to take advantage of the opposing party and to interfere with judicial decision
15 | making or otherwise manipulate the legal process.  There is no claim here that the
16 | failure to file a response prior to January 16th, 2006 was purposeful to take advantage
17 | of Pure, interfere with the judicial decision making or otherwise manipulate the legal
18 | process.  In fact, the undisputed declaration of Mr. Seidel was that he was in the
19 | process of preparing a response, which he erroneously believed he had until January
20 | 30th, the hearing date, to file.
21 |      Falken also relied extensively on Judge Fess's opinion in <u>T.L. Quach v. Cross</u>,
22 | 2004 U.S. Dist. LEXIS 28983 (Cent. Dist. CA 2004), which set forth in an exhaustive
23 | opinion, the test relating to whether relief should be granted from a default, stating
24 | that the test is (1) whether the plaintiff would be prejudiced, (2) whether the defendant
25 | has a meritorious defense, and (3) whether the culpable conduct of the defendant led to
26 | the default.  Judge Fess noted that the test was disjunctive.  Pure apparently agrees
27 | that these factors are to be applied "disjunctive" (Pure Memo at 2), yet cites <u>Franchise</u>
28 | <u>Holding II, LLC. v. Huntington Restaurant Group, Inc.</u>, 375 F.3d 922 (9th Cir. 2004)

2

1  for the proposition that the district court is free to deny the motion, unless all three

2  factors are met, which would make the test conjunctive rather than disjunctive. Judge

3  Fess, in his opinion in <u>Quach</u>, which Pure does not address, noted that Franchise

4  Holding appears to be directly contrary to <u>TCI</u>. And although <u>Franchise Holding</u> was

5  decided after <u>TCI</u>, the Ninth Circuit, in a subsequent decision <u>Pincay v. Andrews</u>, 389

6  F.3d 853, 855 (9th Cir. 2004)[1], which was decided en banc, adopted a liberal rule

7  relating to excusable neglect. 389 F.3d at 859.

8  ### Pure Has Not Been Prejudiced

9  The legal test for prejudice is whether the plaintiff's ability to pursue his claims

10  would be hindered if the default is set aside. <u>Falk v. Allen</u>, 739 F.2d 461, 463 (9th Cir.

11  1984), <u>Davis v. Musler</u>, 713 F.2d 907, 916 (2d Cir. 1983), See Wright, A. Miller, M.

12  Kane, Federal Practice and Procedure, Section 269 at pages 536-37. Pure does not

13  address any of these cases or this point in its memorandum in opposition to the motion.

14  Instead, Pure argues that it needs the immediate use of its judgment in order to

15  bludgeon Falken in regards to proceedings against Pure in Europe. Pure Memo at 21.

16  Ironically, Pure complains about continuing trade libel even though in the last 52

17  weeks, Pure's stock has quadrupled from its low, notwithstanding Pure's claim it is

18  being irreparably damaged by the press releases. See Exhibit A, Chart of Pure's stock

19  prices during the relevant period and a comparison chart of Pure's stock price

20  compared to the NASDAQ for the same period. Nor does Pure contest that it suggested

21  to the Ninth Circuit that the briefing schedule on the appeal be stayed in order to

22  explore "a global settlement." Surely, Pure cannot stall the underlying appeal on one

23  hand and claim prejudice concerning the short delay in resolving their Motion to

24  Confirm.

25  ///

26

27

[1] Even Pure recognizes the significance of <u>Pincay</u> and cites it at page 6 of their Memorandum of Points

28  and Authorities, although Pure ignores <u>Pincay's</u> holding, which in fact found that ignorance of the law could constitute excusable neglect.

3

### Falken Has Meritorious Defenses

Falken filed an appeal from this Court's Order Compelling Falken to Arbitrate, which arbitration led to the award which Pure now seeks to confirm. Falken filed its opening brief on June 10, 2005. Pure initially sought an extension of time to file its response and on October 10th, Pure requested a stay of the briefing schedule in order for the parties to discuss a global resolution. Thereafter, Pure continued to file augmentations to the Ninth Circuit regarding status. In addition, as part of their October 10th filing, which is Exhibit 2 to Falken's motion, Pure included as part of their status report, a Protective Motion to Dismiss, which motion was never formally or separately filed, and for which no briefing schedule was ever set by the Court.

On February 24th, 2006, the Ninth Circuit entered a one paragraph order dismissing Falken's appeal as moot. On or about March 6, 2006, Falken filed a Motion to Vacate the Court's Order of February 24th, on the grounds that the appeal was not moot. A copy of Falken's Motion to Vacate is attached as Exhibit B. Thereafter, Pure filed a Declaration by Charles Brumfield in opposition to Falken's Motion. A copy of that Declaration is attached as Exhibit C. Notably, Pure provided no legal authority to contravene controlling authority by the Supreme Court of the United States and persuasive authority by both the Ninth Circuit and Seventh Circuit that the appeal was not moot. Falken reasonably anticipates that the Ninth Circuit will vacate its order and that the appeal will be reinstated. Assuming Falken's prediction is accurate, Falken respectfully suggests that at the very least, this Court stay its ruling on the Motion to Vacate the Confirmation of the Award until the Ninth Circuit has an opportunity to rule on the pending Motion to Vacate the Dismissal of the Appeal. Surely it would be inappropriate for the Court to confirm an award while the Ninth Circuit has before it the issue of whether Falken was compelled to arbitrate in the first instance.

Even if the Ninth Circuit refuses to reinstate the appeal, Falken still has a meritorious defense in that this Court did not have jurisdiction to compel Falken to

4

1    arbitrate so that its Order was void.  Pure, in its Motion to Dismiss, relied extensively

2    on <u>DSMC, Inc. v. Convera</u>, 349 F.3d 679 (D.C. Cir. 2003).  In that case, Convera

3    appealed a denial of a Motion to Compel Arbitration.  Chief Judge Roberts, writing for

4    the court, examined the court's appellate jurisdiction as a threshold matter.  He

5    reasoned that there were only three possibilities for appellate jurisdiction:  Section

6    1291, Section 1292(a)(1), or Section 16 of the Federal Arbitration Act.  The court found

7    that Sections 1291 and 1292(a)(1) were inapplicable.  349 F.3d at 682.  The court then

8    analyzed whether it had appellate jurisdiction pursuant to Section 16 of the FAA.  The

9    court specifically and unequivocally held that if the underlying motion was brought

10   pursuant to Section 4 of the FAA, then Section 16 would be applicable and the court

11   would have appellate jurisdiction. Id at 682.  "The question thus becomes whether

12   Convera's motion is under Section 4 of the FAA. . ." Id. at 682.

13        However, the court found that the Motion to Compel was not brought under

14   Section 4 of the FAA because Section 4 requires a written contract signed by the

15   parties.

16        "Section 4, however, applies only to an 'alleged failure'. . .to arbitrate under a

17        written agreement for arbitration – not an alleged failure to arbitrate when
         principles of equitable estoppel indicate that you should.  Convera argued that

18        the DSMC/NGTL contract 'satisfies the written arbitration agreement
         requirement,'. . .but Section 4 does not merely require that there be a written

19        agreement somewhere in the picture.  It requires that the Motion to Compel be

20        based on an alleged failure to arbitrate under that written agreement.
         Convera's Motion to Compel is not based on any alleged failure by DSMC to

21        arbitrate under the only written agreement at issue here – the one between

22        DSMC and NGTL. [The Core Settlement Agreement was between NVID and
         Pure.] The Motion is instead based on an effort to expand DSMC's obligation

23        <u>beyond</u> the terms of that written agreement to principles of equitable estoppel,

24        as appellant's acknowledge 'the Doctrine of Equitable Estoppel applies where
         there is no written contract between the parties. . .'" (Emphasis in the original).

25        349 F.3d at 683.

26   Estoppel cannot fulfill the jurisdictional requirement of Section 4 that a written

27   contract signed by both parties exists.  Without a written contract signed by both

28   parties, Section 4 does not apply and the court has no jurisdiction to enter an order

                                         5

1 compelling arbitration pursuant to Section 4 of the FAA.

2      Pure argues that <u>Convera</u> does not prohibit a district court from using equitable

3 estoppel to compel arbitration. Pure Memo at 12. Pure's quotation, however, from

4 <u>Convera</u>, is cropped and is therefore misleading. While Pure cites the language in the

5 opinion that "<u>Convera</u> recognizes that there is no precedent from this Court compelling

6 a party to an arbitration agreement to arbitrate with a non-signatory on the basis of

7 equitable estoppel. . .but cites to other cases that have done so. . . .Pure omitted the

8 following sentence: "Those cases typically did not address jurisdiction under Section 16

9 of the FAA, but instead simply proceeded directly to consider the propriety of

10 compelling signatories to arbitrate with non-signatories." The very next sentence,

11 which is underscored in Pure's brief, reads "We need not and do not decide whether

12 such an effort can ever succeed." In other words, the reference to whether a non-

13 signatory can be compelled to arbitrate under principles of equitable estoppel in a non-

14 FAA setting is not an issue that Convera needs to decide and does not decide. Falken

15 respectfully submits that Chief Judge Roberts is simply not foreclosing the possibility

16 that a district court, in a non-FAA case, could find that a non-signatory could be bound

17 to arbitrate. That, however, is a far cry from authorizing the non-signatory to arbitrate

18 under Section 4 of the FAA. As the court explained in the very next sentence "What we

19 do decide is that an effort to compel arbitration in such circumstances on the basis of

20 equitable estoppel does not fall within Section 4 of the FAA."

21      In fact, even Pure at one point, seemed to recognize this distinction when it

22 conceded in the Ninth Circuit that "This Court's order compelling arbitration was

23 technically not a Section 4 order. Recent federal authority strongly suggests that an

24 order based upon equitable estoppel (as compared to an executed 'written agreement to

25 arbitrate') is technically not a Section 4 order." Motion at 5.

26      <u>In re Universal Service Fund Telephone Billing Practice Litigation v. Sprint</u>

27 <u>Communications</u>, 428 F.3d 940 (8th Cir. 2005), is to the exact same effect. Indeed, the

28 court highlighted Convera's requirement that in order for Section 4 to apply, the

6

1 | Motion to Compel must be based on the alleged failure to arbitrate under that written

2 | contract. The Eighth Circuit found that analysis to be sound. 428 F.3d at 944.

3 |     Pure's argument that Falken has waived any defense to the confirmation of the

4 | award because it did not file a Motion to Vacate within three months as required by

5 | Section 12 of the FAA is unavailing if the FAA did not originally require Falken to

6 | arbitrate. If Section 4 of the FAA did not apply, then none of the other Sections of the

7 | FAA would apply and the time limitations in Section 12 would not be applicable to the

8 | wrongly compelled arbitration. Falken's claim that it can still raise its defenses to the

9 | confirmation of the award because the FAA does not apply, survives whether the

10 | original appeal was dismissed or not.

11 |     Further, Pure's reliance on Cullen v. Paine, Webber, Jackson & Curtis, Inc., 863

12 | F.2d 851, 853-54 (11th Cir. 1989) to the effect that one cannot raise a Motion to Vacate

13 | as an affirmative defense after three months is misplaced. In that case, the arbitration

14 | award was entered on June 24th, 1987. On November 20, 1987, Paine Webber moved

15 | to confirm the award. The confirmation of the award was filed more than three months

16 | after the award was entered. The respondent then filed his opposition to the

17 | confirmation award on December 9th. Unlike Paine Webber, Pure filed its suit to

18 | confirm the award within three months of the time that the award was entered, so that

19 | there is no policy reason why Falken's opposition should not relate back to the filing of

20 | Pure's suit to confirm the award. The confirmation proceeding is neither protracted

21 | nor shortened by whether claimant moved first to confirm the award or respondent

22 | moved first to vacate the award. The briefing schedule would have been the same had

23 | Falken moved to vacate the award rather than Pure. Similarly in Florasynth, Inc. v.

24 | Pickholz, 750 F.2d 171 (2d Cir. 1984), relied upon by the Cullen court, the claimant

25 | moved after the three-month period to confirm the award, so again there was no issue

26 | of the affirmative defense relating back to the time that the confirmation petition was

27 | filed so that it would fall within the three month period provided under the FAA.

28 |     In fact, Falken's response was due on January 16th. Assuming it had been filed

7

1    timely, that response would have been in excess of 90 days from the time the award
2    was entered, so that under Pure's formulation, it would have been time barred. Falken
3    suggests that such an absurd result substantiates its position that the response relates
4    back to the time of filing the Motion to Confirm, so that as long as the Motion to
5    Confirm was filed within the three month period, Falken's response and any extension
6    obtained for filing such response, would be timely.

7         As to the substance of the defenses, they have been set forth in the original
8    Rovell declaration, filed with the Motion to Vacate and if substantiated at a hearing,
9    would provide a basis for relief on the ground that the arbitrator ". . . exceeded [his]
10   powers, or so imperfectly executed them that a mutual, final, and definite award upon
11   the subject matter submitted was not made." 9 U.S.C. §10(a)(4). There is no question
12   that the arbitrator ruled in the NVID award that Falken was a de facto merger partner
13   with NVID and Pure does not contest, in its opposition papers, that the arbitrator felt
14   that that finding was binding on Falken, even though Falken did not appear. It is
15   disingenuous for Pure to claim, in its moving papers, that when it went to the NVID
16   hearing, it anticipated that Falken would be present to defend itself, as Falken went to
17   the trouble and expense of filing a lawsuit in the United States District Court for the
18   Southern District of New York to avoid having to arbitrate these claims until it was
19   ordered to do so by a court of competent jurisdiction. Falken obtained such a
20   stipulation, and had every reason to believe that Pure would honor. To allow Pure to
21   litigate its claims against Falken on the pretext of a claim against NVID would be
22   simply to permit Pure to use the back door after it had been barred from using the
23   front door.

### Falken's Conduct Was Not Culpable

25        For the reasons and authorities set forth above, Falken's inadvertence in not
26   filing its opposition papers on January 16th, does not constitute culpable conduct
27   which precludes it from obtaining relief. As set forth earlier, there is no suggestion
28   that failure to file a response prior to January 16th, 2006 was purposeful to take

8

1 │ advantage of Pure, interfere with the judicial decision-making process or otherwise

2 │ manipulate the legal process.

3 │ In addition, Falken, which is a small, non-public company in Europe, is at a

4 │ distinct disadvantage to Pure, which is a public company, and has the ability to raise

5 │ almost unlimited capital to pay legal fees for the three arbitrations that it has

6 │ instituted and the three federal lawsuits that it has filed. As shown more fully in Mr.

7 │ Rovell's declaration, Pure also has the advantage of a full time staff lawyer, on salary,

8 │ plus a salaried paralegal. Falken, on the other hand, does not have the financial

9 │ resources to keep up with Pure and is seriously in arrears in paying legal fees that are

10 │ outstanding.

11 │ ## Conclusion

12 │ For the reasons and authorities stated above, Falken respectfully requests that

13 │ the Court vacate its order of January 18th, 2006 and the ensuing judgment and then

14 │ stay the Motion to Confirm the Award until the Ninth Circuit Court of Appeals rules

15 │ upon Falken's Motion to Vacate its Dismissal Order of February 24th, 2006, and if

16 │ Falken's Motion is granted in the Ninth Circuit, to order a stay pending resolution in

17 │ the Ninth Circuit of the appeal. Solely in the alternative, if the Ninth Circuit denies

18 │ Falken's Motion to Vacate its Order of February 24th, 2006, hold an evidentiary

19 │ hearing and or briefing schedule relating to the defenses raised herein prior to the

20 │ confirmation of any award.

21 │ Dated: March 27, 2006

22 │

23 │ By _____

24 │ One of its Attorneys

25 │ Joel S. Seidel, SB #175275
   │ 9939 Louise Avenue
26 │ Northridge, CA 91325
   │ Tel: (818) 832-7850; Fax: (818) 832-7889
27 │

28 │

9

1

<u>Proof of Service</u>

2   The undersigned attorney for Falken Industries certifies that he served a copy of
the foregoing Reply Memorandum In Support Motion To Vacate on the following
3   counsel for Petitioner Pure Bioscience by placing a copy for each in properly addressed,
postage pre-paid envelopes and depositing them in the U.S. mail on March 27, 2006:

4

Wolfgang F. Hahn                        Charles E. Brumfield
5   Wolfgang F. Hahn& Associates         C/o Pure Bioscience
7160 Caminito Pepino                    1725 Gillespie Way
6   La Jolla, CA  92037                  El Cajon, CA  92020

7

8

9   Joel S. Seidel

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

10

**EXHIBIT A**

Case 3:05-cv-02020-L-NLS   Document 19   Filed 03/28/06   PageID.346   Page 13 of 65

PURE.OB: Basic Chart for PURE BIOSCIENCE - Yahoo! Finance                    Page 1 of 2

Yahoo!  My Yahoo!  Mail    Make Yahoo your home page

**YAHOO! FINANCE**   Welcome, rovelliaw
[Sign Out, My Account]

Search the Web [........] [Search]

Finance Home - Help

Dow  **11,076.34** ↑104.06 (0.95%)  Nasdaq  **2,262.04** ↑12.32 (0.55%)  S&P 500  **1,281.58** ↑9.35 (0.73%)

30-yr Bond   4.742%  ↑0.03  NYSE Volume   2,148,539,000  Nasdaq Volume   1,789,301,0

jaghv   N/A

Friday, March 10, 2006, 5:59PM ET - U.S. Markets Closed. Dow +0.95% Nasdaq +0.55%

**Home   Investing   News & Commentary   Retirement & Planning   Banking & Credit   Loans   Taxes   My Port**

Market Overview   Market Stats   Stocks   Mutual Funds   ETFs   Bonds   Options   Industries   Currency   Education

**Get Quotes** [........] [GO] Symbol Lookup | Finance Search

## Pure Bioscience (PURE.OB)

At 3:58PM ET: **2.15** ↑

$7 stock trades        Plus 25 free trades        Trade with Fidelity.        Free Money

**Basic Chart**                          Get **Basic Chart(s)** for: [........] [GO]

**PURE BIOSCIENCE** (OTC BB)                                             [Edit]

Range: 1d 5d 3m 6m **1y** 2y 5y max   Type: Bar | **Line** | Cdl   Scale: **Linear** | Log   Size: M | L

Compare: PURE.OB vs [........]   □ S&P  □ Nasdaq  □ Dow  [Compare]



PURE BIOSCIENCE
as of 9-Mar-2006                                        Splits: ▼

Copyright 2006 Yahoo! Inc.                         http://finance.yahoo.com/

Splits:02-Nov-00 [102:100]

| | | | |
|---|---|---|---|
| Last Trade: | **2.15** | Day's Range: | 2.02 - 2.15 |
| Trade Time: | 3:58PM ET | 52wk Range: | 0.52 - 2.12 |
| Change: | ↑0.13 (6.44%) | Volume: | 90,101 |
| Prev Close: | 2.02 | Avg Vol (3m): | 113,298 |
| Open: | 2.02 | Market Cap: | 38.01M |
| | | P/E (ttm): | N/A |

Case 3:05-cv-02020-L-NLS   Document 19   Filed 03/28/06   PageID.347   Page 14 of 65

PURE.OB: Basic Chart for PURE BIOSCIENCE - Yahoo! Finance                    Page 2 of 2

| | | | |
|---|---|---|---|
| Bid: | 2.10 x 500 | EPS (ttm): | -0.03 |
| Ask: | 2.17 x 500 | Div & Yield: | N/A (N/A) |
| 1y Target Est: | N/A | | |

**Compare Current Mortgage Rates! $160K loan as low as $633/mo.**

✉ Add to Portfolio   ✿ Set Alert   ✉ Email to a Friend

Get **Basic Chart(s)** for Another Symbol: [        ] 🔘GO🔘 Symbol Lookup

- Historical Prices                    • Market Overview

---

Copyright © 2006 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service - Copyright/IP Policy

**Quotes delayed**, except where indicated otherwise.
Delay times are 15 mins for NASDAQ, 20 mins for NYSE and Amex. See also delay times for other exchanges.

Historical chart data and daily updates provided by Commodity Systems, Inc. (CSI). International historical chart data and daily updates provided by Hemscott Americas. Financials data provided by Edgar Online.Fundamental company data provided by Capital IQ. Quotes and other information supplied by independent providers identified on the Yahoo! Finance partner page. All information provided "as is" for informational purposes only, not intended for trading purposes or advice. Neither Yahoo! nor any of independent providers is liable for any informational errors, incompleteness, or delays, or for any actions taken in reliance on information contained herein. By accessing the Yahoo! site, you agree not to redistribute the information found therein.

Case 3:05-cv-02020-L-NLS   Document 19   Filed 03/28/06   PageID.348   Page 15 of 65

PURE.OB: Basic Chart for PURE BIOSCIENCE - Yahoo! Finance                    Page 1 of 2

Yahoo!  My Yahoo!  Mail    Make Yahoo! your home page

**YAHOO! FINANCE**   Welcome, rovelilaw   [Sign Out, My Account]     Finance Home - Help     Search the Web    [ Search ]

Dow 11,076.34 ↑104.06 (0.95%)  Nasdaq 2,262.04 ↑12.32 (0.55%)  S&P 500 1,281.58 ↑9.35 (0.73%
30-yr Bond   4.742%  ↑0.03  NYSE Volume   2,152,041,000  Nasdaq Volume   1,793,345,0
                                                          jaghv              N/A
Friday, March 10, 2006, 6:58PM ET - U.S. Markets Closed. Dow +0.95% Nasdaq +0.55%

**Home   Investing   News & Commentary   Retirement & Planning   Banking & Credit   Loans   Taxes   My Port**
Market Overview   Market Stats   Stocks   Mutual Funds   ETFs   Bonds   Options   Industries   Currency   Education

Get Quotes  [            ]   [GO] Symbol Lookup | Finance Search

## Pure Bioscience (PURE.OB)                       At 3:58PM ET: 2.15 ↑

$7 stock trades        Free Money        Trade smarter        Ameritrade Apex™

**Basic Chart**                    Get Basic Chart(s) for: [          ] [GO]

**PURE BIOSCIENCE** (OTC BB)                                     [Edit]

Range: 1d 5d 3m 6m 1y 2y 5y max   Type: Bar | Line | Cdl   Scale: Linear | Log   Size: M | L

Compare: PURE.OB vs [            ]   ☐ S&P  ☑ Nasdaq  ☐ Dow  [Compare]



Splits:02-Nov-00 [102:100]

| Last Trade:  | **2.15**         | Day's Range:   | 2.02 - 2.15 |
|--------------|------------------|----------------|-------------|
| Trade Time:  | 3:58PM ET        | 52wk Range:    | 0.52 - 2.12 |
| Change:      | ↑ 0.13 (6.44%)   | Volume:        | 90,101      |
| Prev Close:  | 2.02             | Avg Vol (3m):  | 113,298     |
| Open:        | 2.02             | Market Cap:    | 38.01M      |
|              |                  | P/E (ttm):     | N/A         |

Case 3:05-cv-02020-L-NLS   Document 19   Filed 03/28/06   PageID.349   Page 16 of 65

PURE.OB: Basic Chart for PURE BIOSCIENCE - Yahoo! Finance                                Page 2 of 2

| | | | |
|---|---|---|---|
| Bid: | 2.10 x 500 | EPS (ttm): | -0.03 |
| Ask: | 2.17 x 500 | Div & Yield: | N/A (N/A) |
| 1y Target Est: | N/A | | |

### Open a TradeCentral account and get Free Trades for A Month

✉ Add to Portfolio   ☆ Set Alert   ✉ Email to a Friend

Get **Basic Chart(s)** for Another Symbol: [          ] **GO** Symbol Lookup

- Historical Prices          • Market Overview

Copyright © 2006 Yahoo! Inc. All rights reserved. Privacy Policy - Terms of Service - Copyright/IP Policy

**Quotes delayed**, except where indicated otherwise.
Delay times are 15 mins for NASDAQ, 20 mins for NYSE and Amex. See also delay times for other exchanges.

Historical chart data and daily updates provided by Commodity Systems, Inc. (CSI). International historical chart data and daily updates provided by Hemscott Americas. Financials data provided by Edgar Online. Fundamental company data provided by Capital IQ. Quotes and other information supplied by independent providers identified on the Yahoo! Finance partner page. All information provided "as is" for informational purposes only, not intended for trading purposes or advice. Neither Yahoo! nor any of independent providers is liable for any informational errors, incompleteness, or delays, or for any actions taken in reliance on information contained herein. By accessing the Yahoo! site, you agree not to redistribute the information found therein.

**EXHIBIT B**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| PURE BIOSCIENCE, fka Innovative Medical Services, | No. 05-55203 |
| | D.C. No. CV-04-01147-MJL |
| Petitioner - Appellee, | Southern District of California, San Diego |
| v | |
| FALKEN INDUSTRIES LIMITED, a New Jersey Corporation, | |
| Respondent - Appellant. | |

MOTION TO RECONSIDER ORDER OF
DISMISSAL AND RESTORE APPEAL

Appellant, Falken Industries, Ltd., by its attorneys, respectfully request this Court to reconsider its one paragraph order dated February 24th, 2006, which dismissed the appeal for lack of jurisdiction ostensibly on the basis that the appeal was moot because an intervening event made it impossible for the Court of Appeals to grant any effectual relief to the prevailing party. The order does not specify the intervening event which made it impossible for the Court of Appeals to grant effectual relief to the prevailing party. A copy of the Court's order is attached as Exhibit 1. It is assumed that the intervening event was either (1) the completion of the arbitral hearing or (2) the misbelief that Falken was no longer opposing confirmation of the award. These "events" are discussed seriatim.

This Court cited United States v. Tanoue, 94 F.3d 1342, 1344 to support its decision concerning mootness. However, in Tanoue, this Court specifically found that an appeal by a

1

witness ordering him to give handwriting exemplars to the IRS was not mooted by the fact that such exemplars were given. The Court found that the appeal was not moot because the Court, among other things, would have the ability to order that the exemplars be destroyed. Here, although the arbitration was completed in August, 2005, the issue of whether Falken was properly compelled to arbitrate is still viable as Falken has opposed Pure's attempt to confirm the underlying award. Hence, if Falken was not properly compelled to arbitrate, then a fortiorari, the award should not be confirmed.

In Graphic Communications Union v. Chicago Tribune, 779 F.2d 13 (7th Cir. 1985), the district court compelled defendant newspaper to arbitrate. Defendant newspaper sought a stay of the arbitration in the district court, which was denied because the trial court found that the defendant had in all likelihood in prevailing on the appeal. The Court of Appeals likewise denied the stay went on the basis that defendant newspaper could not show that it would suffer irreparable injury if the stay were denied. Significantly, the Court of Appeals declined to base its declination of the stay on the ground that there was little likelihood of success of prevailing on the appeal because the court stated it had "[N]o desire to prejudice the appeal by premature comments we shall say nothing about our view of the likelihood of the appeal's succeeding." 779 F.2d at 13. Clearly, the Seventh Circuit believed that the appeal would still be extant even after the arbitration was completed.

In Church of Scientology of California v. United States, 506 U.S. 9 (1992), a case relied upon by this Court in its decision in United States v. Tanque, the Supreme Court reversed this Court's holding that the Church's appeal concerning the turnover of two tape recorded conversations between church officials and their attorneys to the IRS mooted the appeal. In

2

Calderon v. Moore, 518 U.S. 149 (1996), another case relied upon by this Court in United States v. Tanoue, the Supreme Court reversed this Court's dismissal of an appeal by the state of an order of the district court granting habeas corpus relief which ordered that the defendant prisoner was entitled to a new trial when the state granted the accused a new trial. The Supreme Court held that the relief need not be fully satisfactory to avoid mootness – the availability of a partial remedy is sufficient to prevent a cause from being moot. 518 U.S. at 149.

Similarly, in Wirtz v. Local 153 Glass Bottle Blowers Assoc. of the United States, 389 U.S. 463 (1967), the Supreme Court reversed the Third Circuit's dismissal of the Secretary of Labor's appeal as moot. In that case, the district court found that the union election had violated statutory standards, but nevertheless dismissed the suit on the ground that the Secretary had not established that the violation had affected the outcome. While the appeal was pending, the union conducted its next regular unsupervised election and the Court of Appeals held that the intervening election mooted the Secretary's appeal. On certiorari, the Supreme Court reversed and held that the subsequent election did not moot the Secretary's original lawsuit.

Finally, in Grupo Mexicano de Desarrollo v. Alliance Fund, Inc., 527 U.S. 308 (1999), a company's interlocutory appeal of a preliminary injunction prohibiting the company from disposing of certain assets did not become moot on the district court granted summary judgment against the company and converted the preliminary injunction into a permanent injunction. The Supreme Court noted that there were legal effects concerning the preliminary injunction as it related to the bond, so that the company's failure to appeal the permanent injunction did not forfeit the company's claim that the preliminary injunction was wrongful and the fact that the company lost the case on the merits did not mean that the company did not possess a claim that it

had been wrongfully enjoined. Here, there are different legal effects emanating from the order to compel arbitration than the ultimate award. As the court explained in American Builder's Assoc. v. Au-Yang, 226 Cal. App.3d 170 (Cal. App. Second Dist. 1990), a person who is not a signator to the arbitration agreement is entitled to have the question as to whether he is bound by the arbitration agreement is decided in the first instance by a court rather than an arbitrator because if it were decided by the arbitrator, the party would be without effective review as the sufficiency of the evidence of the arbitrator's decision would not be a basis to vacate an award. Hence, the only protection to assure that a party like Falken, who has not signed the arbitration agreement from being improperly bound to such an agreement, is to provide that the question be decided by the court rather than an arbitrator and afford the party to be able to have an appeal from that order. 226 Cal. App.3d at 179.

Falken respectfully submits that at the time this Court entered its order dismissing the appeal, that it was under the misapprehension that Falken was no longer opposing the confirmation of the arbitral award and that there no longer existed a controversy between the parties which would have mooted the appeal. Pure unsolicitedly periodically sent status reports to this Court concerning its overall view of not only the appeal, but what was occurring in the related litigation. In its Fourth Augmentation of Pure's Status Report and Request for Extension of Stay and Protective Motion to Dismiss, Pure advised that Falken failed to oppose the petition to confirm the arbitral award and that Judge Lorenz entered an order on January 19th, 2006 granting Pure's petition for entry of a final judgment. Falken however, filed a Motion to Vacate that order on February 1st. A copy of that motion is attached as Exhibit 2 to this Motion. The

4

Motion to Vacate remains pending.[1]  A current copy of the docket sheet is attached as Exhibit 3 to this Motion.

Wherefore, appellant Falken Industries, Inc. requests that this Court reconsider its order of dismissal and restore the appeal and require appellee Pure Bioscience to file its responsive brief on a date certain.

By _____

Michael J. Rovell

Dated: March 6, 2006

---

[1]Pure's "Status Report" was not received until January 30th.  Undersigned counsel left for California on January 31st and did not see Pure's Status Report before he left.  Immediately upon his return from Los Angeles, counsel was hospitalized and the first day that he was back in his office was on February 23rd.  The Status Report was not called to his attention as no additional relief was requested by Pure and no briefing schedule had been set by the court.

**EXHIBIT C**

No. 05-55203

# UNITED STATES COURT OF APPEALS
# NINTH CIRCUIT

PURE BIOSCIENCE,
    a California corporation,

    *Petitioner/Appellee,*

vs.

FALKEN INDUSTRIES, LTD.,
    a New Jersey corporation,

    *Respondent/Appellant.*

---

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA
### Honorable M. JAMES LORENZ
### [USDC Case No. 04-CV-1147-L [NLS]

---

## DECLARATION OF CHARLES E. BRUMFIELD IN OPPOSITION TO FALKEN'S "MOTION TO RECONSIDER ORDER OF DISMISSAL AND RESTORE APPEAL"

---

WOLFGANG F. HAHN, ESQ.
WOLFGANG F. HAHN & ASSOCIATES
7160 Caminito Pepino
La Jolla, California 92037
Telephone : 858. 535. 1000
Telecopier: 858. 456. 5080

CHARLES E. BRUMFIELD, ESQ.
c/o PURE BIOSCIENCE
1725 Gillespie Way
El Cajon, California 92020
Telephone : 619.596.8600 x 138

Attorneys for PURE BIOSCIENCE
fka INNOVATIVE MEDICAL SERVICES

//
//

1

I, Charles E. Brumfield, declare as follows:

1.      I am an attorney licensed to practice before the state and federal courts in California. I know the facts stated below of my own knowledge and if called could and would testify competently thereto.

2.      As assistant counsel to PURE, I acted as counsel to PURE in the underlying arbitration between PURE and Falken before Arbitrator Fitzmaurice ("Arb 1.5"). The final Award of Arbitrator in favor of PURE was issued on October 12, 2005 and was delivered to the parties on October 14, 2005.

3.      PURE filed its petition to enter judgment on arbitral award (Case No. 05 CV 2020 L (NLS), and received a continued hearing date for that petition before Judge Lorenz of January 30, 2006.

4.      Falken failed to oppose the PURE petition, and the district court granted PURE's petition and thereafter entered judgment in favor of PURE on January 20, 2006. PURE provided notice to this Court of these events.

5.      Falken has since filed a "Motion to Vacate the Order of January 18, 2006 and the Ensuing 'Judgment.'" This Falken motion to vacate is not well taken. Accordingly, PURE on February 27, 2006, filed its opposition to the underlying Falken motion.

6.      The Opposition Memorandum of Points and Authorities (Exhibit "1," hereto) and *the Opposition Declaration of Brumfield (Exhibit "2," hereto) make it abundantly clear that Falken has no legitimate excuse for failing to oppose PURE's petition to enter judgment on arbitral award.* Further, PURE establishes that Falken's failure to abide by FAA section 12 by bringing on a motion to vacate the arbitral award within the statutorily mandated "three months," precludes its late assertion of "affirmative defenses." Additionally, the PURE opposition

paperwork confirms that Falken has no meritorious defense to confirmation (which is a predicate to any relief from default). Finally, the opposition paperwork exposes the Falken global strategy of delaying the arbitral cases and confirmation thereof in America, while Falken, Nickel and Gouiran proceed unabated with a blitzkrieg of litigation and arbitration against PURE in France and Stockholm (such that the "equities" weigh heavily in favor of PURE).

7. Falken did not file a timely Reply to the referenced Opposition paperwork of PURE regarding Falken's motion to vacate.

8. During the morning hours of March 7, 2006, your declarant spoke with Falken attorney-of-record, Joel Seidel. Mr. Seidel informed me that Falken was planning to seek an extension of the present "motion to vacate" hearing date of March 13, 2006. According to Attorney Seidel, this prospective *ex parte* application will be based on the assertion that Attorney Rovell (the author of the herein motion for reconsideration) is too ill to do legal work.

9. PURE had earlier declined a written invitation of Falken to extend the "motion to vacate" hearing date, although we expressed no objection to a late-filing of the Reply paperwork within the framework of the existing hearing date. This PURE decision was based upon issues addressed in your declarant's recent written communication to Attorney Rovell:

> "Subsequent to the time that we learned from Mr. Seidel that your health prevents you from attending to the reply to our opposition to your motion to vacate the judgment against Falken, I was pleased to see that you had sufficiently recovered to submit discovery to PURE in Arb II and now to oppose our motion to disqualify Mr. Gouiran's criminal counsel from sitting as a "disinterested" neutral in Arb III. I assume that you will also be well enough to prepare a reply to our opposition to Nickel's motion to stay Arb II. In addition to your ability to do the work that pressures and inconveniences PURE or otherwise neuters the legitimate domestic arbitrations, I assume that you are also sufficiently recovered to reply to our opposition in the confirmation matter. Any other course would be grossly unfair to my client, and would be merely a continuance of a pattern of delaying American justice while

3

pursuing at least three French litigations and the Stockholm Arb III to your client's advantage. You may recall that it has been only 10 days since, for "strategic reasons," you refused my offer to stay Arb III to assist you in your recovery from your recent health issues . . . Receiving a timely ruling on Nickel's (sic) motion to vacate the judgment of confirmation is particularly important to my client, which has an upcoming date later in March to publish its quarterly 10Q with the SEC. Be mindful that after the federal court entered its judgment confirming the arbitral award against Falken, and after you and attorney Seidel were notified of that fact, Gouiran issued the February 3rd press release indicating in effect that there was no such judgment against Falken and in favor of PURE . . . (press release quotation here omitted) Our shareholders and the business community deserve to know at the earliest feasible moment that a judgment against Falken and in favor of PURE has indeed been entered by the federal court and survived the frivolous attack promulgated in the pending motion to vacate. We are extremely desirous of announcing that litigation result in our 10Q (just after the hearing now set for March 13), and to set the record straight in the aftermath of the fraudulent press release your client(s) caused to be issued on February 3rd. For those reasons, PURE cannot in good conscience disadvantage its own shareholders by accommodating any further Gouiran-directed delays, and in the view of PURE the March 13th hearing must proceed as scheduled. Having said that, PURE has no objection to Falken late-filing its reply documentation, so long as the hearing date is not disturbed and that PURE receives prompt electronic service of same."

> (Letter to Attorney Rovell dated March 3, 2006, attached here to as Exhibit "3").

10.     PURE's position remains that same as it was in the protective motion to dismiss this interlocutory appeal. Once the underlying arbitration was final ("Arb 1.5"), the interlocutory appeal became moot. In the event that the confirmation proceeding in Case # 05 CV 2020 L (NLS) is relevant to the mootness issue, PURE has presented its underlying opposition briefing (without internal exhibits) to confirm that Falken's belated challenge to confirmation is meritless. Falken's relief, if at all, will come from an appeal of final judgment.

11.     The exhibits to this declaration and the materials quoted in the referenced letter to Attorney Rovell are true and correct copies of the original.

I declare the foregoing to be true and correct under penalty of perjury under the laws of the state of California and those of these United States. Executed this ___8___ of March 2006, at El Cajon, California.

Charles E. Brumfield,
Assistant Counsel to PURE

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PURE BIOSCIENCE fka INNOVATIVE MEDICAL SERVICES, INC.,<br><br>　　　　　　　　Petitioner,<br><br>v.<br><br>FALKEN INDUSTRIES, LTD., a New Jersey corporation,<br><br>　　　　　　　　Respondent. | Civil No. 05-CV-2020-L(NLS)<br><br><br>DECLARATION OF<br>MICHAEL J. ROVELL |

Michael J. Rovell declares under penalties of perjury as follows:

1.　　I am an attorney licensed to practice law since 1972 and have acted as lead lawyer in the various litigated matters involving Pure Bioscience on one hand and Nickel, Ltd. and/or Falken on the other.

2.　　Attached hereto as Exhibit 1 is my declaration of March 13th, 2006 in Nickel, Ltd. and Falken, Ltd. v. Pure Bioscience, case number 04-cv-2248L (NLS) and call the Court's attention in particular to paragraphs 20-23, which sets forth in detail the practical problems relating to providing legal services for Falken in all the various litigations which Pure has filed and why it has been extraordinarily difficult, if not impossible, to keep up given the limited resources of both Falken and counsel.

3.　　Pure's claim that it was surprised that Falken did not attend the NVID

1

arbitration is totally disingenuous. Falken, throughout, contended that it was not subject to arbitration and even went so far as to file a lawsuit in the United States District Court for the Southern District of New York to obtain a court order compelling Falken to arbitrate before any action in the arbitration proceeding, could be taken against Falken. As a result of a stipulation entered into by Falken and Pure, Falken's lawsuit in federal court was dismissed and it was agreed that no default would be entered against Falken, as Falken announced it did not intend to answer or otherwise participate in arbitration. Pure understood that this was Falken's position, and filed a suit in this Court seeking to compel Falken to arbitrate. The NVID arbitration occurred while Pure's suit to compel Falken to arbitrate was sub judice, so there would be no reasonable belief that Falken would abandon its position and attend a hearing without ever answering or otherwise complying with any of the arbitral procedures relating to that hearing.

4.   If Falken were to have done so, it would have rendered nugatory the whole purpose of the New York proceeding and probably would have mooted Falken's objections to an order compelling arbitration which was then still pending before this Court.

5.   Equally important, Falken never envisioned a hearing in which the issue of whether there was a de facto merger between NVID and Falken would even arise. NVID had previously defaulted over six months earlier so that the anticipated hearing would primarily, if not exclusively, relate to alleged

damages that Pure suffered as a result of NVID's alleged breaches of the Core Settlement Agreement. Falken's conduct qua Falken was not even relevant and the issue of liability was not contested as there was no one at the hearing claiming that NVID had not breached the Core Settlement Agreement.

6.  Significantly, Mr. Brumfield, in his declaration does not refute that Arbitrator Fitzmaurice had said subsequent to his ruling that he believed that Falken was bound by his earlier decision regarding the de facto merger. The "clean slate" comments referred to the arbitrator's position as to damages in which he said several times at the hearing and prior thereto, that he would consider _that_ issue on a clean slate as he had not heard from Falken at the earlier hearing. As to the objection that I made about his finding a de facto merger, which Falken would then be bound by, he believed that Falken made a tactical decision which Falken would have to live with its consequences.

7.  The fact that collateral estoppel may have applied to Pure as a result of the arbitrator's findings in Arb I, is immaterial. Collateral estoppel is appropriate in jurisdictions which do not require mutuality as long as the party to whom estoppel is being asserted had an opportunity to litigate the issue. In Arb I, Pure was the only entity litigating any issue so that it is not unfair to estop them on any issue they may have lost. On the other hand, since Falken was not present, it did not have a chance to litigate and collateral estoppel is not applicable to them.

3

8.     I was personally in attendance throughout the entire hearing and
participated in almost all of the pre-hearing teleconferences. The
arbitrator awarded Pure over $3 million in damages as a result of
messages that appeared on either Raging Bull or the Yahoo! message
board for Pure. The offending messages were anonymous. No expert or
for that matter anyone that was not associated with Pure testified that
anyone gave these messages any credence whatsoever. While these
messages, many of which were little more than name-calling, were
nevertheless blamed for all the ills that Pure encountered. For example,
Pure's stock price went down, which according to Pure, was clearly the
fault of these messages. Ironically, after the arbitration, press releases by
Pure, which Pure has alluded to in its filings with this Court, which press
releases did appear on the Dow Jones and Business Wire, both of which
are substantially greater in stature than anonymous messages on Raging
Bull and Yahoo!, and yet the price of Pure has almost quadrupled.

9.     Falken is blamed for Pure's selling of its water division, even though
Pure's own statements, in its SEC filings, stated that Pure made a
strategic decision to sell the water division so that it could concentrate on
its Axen product because the margins would be so much greater. In fact,
its SEC disclosures provided a long list of questions and answers
concerning the positives and negatives of the transaction without ever
once suggesting that the decision to sell the water division was triggered
by these negative comments on the Internet. In fact, the initial decision to

4

sell the water division was made prior to the alleged blitzkrieg.

10. Similarly, Falken is charged with being the cause of Pure losing the
Walmart contracts. At the hearing, Pure contended that it did not have
the financial ability to meet the production demands that the Walmart
contract would require and but for the messages on the Internet, Pure
would have easily been able to raise the needed capital. At the hearing,
evidence was adduced that Pure had borrowed money from Charles
Siddle and his entities, that they were paying in excess of 40 percent in
interest, and that Pure took the position in a lawsuit brought by Siddle to
collect on the monies that had been lent, that they lost the Walmart
contract because of the high interest rates that Siddle had charged. In
other words, but for Siddle's conduct, Pure would have had sufficient
financial resources to fulfill the Walmart contract. No mention was made
by Pure when defending the civil lawsuit, that Falken had anything
whatsoever to do with their inability to perform the Walmart contracts.
Likewise, Pure took the position in the arbitration proceeding that Siddle
would have lent them more money but for the messages on the Internet.
That position, however, was contrary to the complaint that Siddle had filed
in federal court in Arizona in which he complained that Pure was
committing fraud. Hence, Pure would have the arbitrator believe that
Siddle, who had labeled Pure as a fraudster, would have lent money.

11. Moreover, at the time that Pure was claiming that Siddle would lend them
more money, Siddle was in court trying to collect the money that he had

5

already lent.  Gene Auerbach, Pure's Chief Operating Officer, provided a

declaration in the Siddle litigation, that he believed that Siddle was trying

to take over Pure so that Siddle would be the last person that Pure would

even want to borrow from.  This is true because Siddle already had a

security interest in all of Pure's assets, except for the Axenhol patent.

Further, borrowing by Pure from Siddle would have required Pure to

secure the loan with the Axenhol patent so that if there was a default,

Siddle would have the entire company.  Indeed, this is exactly what

Auerbach feared.  Siddle himself testified that he made more money when

people he lent money to defaulted than if they paid their loan, which is

saying a lot considering the extraordinarily high interest rate which Siddle

was receiving on his money.  Michael Krall, Pure's Chief Executive

Officer, computed that Siddle had received in excess of 40 percent on the

loan.  See Krall and Auerbach declaration in Siddle litigation attached as

Exhibits 2 and 3 to this declaration.

12.   Pure claimed that these messages substantially lowered the price of their

stock and made Pure unbankable.  Pure, however, was unbankable long

before Falken.  If it had been bankable, it would have never agreed to the

Siddle transaction, which is multiples over what one could borrow from a

bank.  Further, considering that Pure had voluntarily given a security

interest in all its assets except for the Axenhol patent as nothing other

than the patent to borrow against.  The stock price kept falling because

Pure kept experiencing losses even when they had been projecting that

6

the quarter would be profitable. Pure's use of private placements became less workable with falling stock prices as the investors who had purchased in earlier private placements saw their placement at a loss because the stock price was now lower than the price they paid in the private investment and the price of the stock was getting so low that more and more shares had to be sold to raise even a modest amount of money, which led to further dilution and a decline in the stock price.

11.    Pure's claim that these messages on the Internet affected its ability to market its technology was not substantiated by testimony from any actual or potential customer, that they either refused to do business with Pure, or change the terms of their arrangement to benefit them and or be detrimental to Pure. While Krall testified that he believed this to be the case, he admitted he was unable to quantify it. Moreover, there was absolutely no disclosure in Pure's SEC documents about this alleged problem. On the contrary, Pure's SEC disclosures announced each of these contracts as a milestone and never disclosed that there were any changes or problems relating to these contracts.

12.    All in all, it defies belief that on the record that was produced at the arbitration, that any arbitrator could find that Pure suffered in excess of $3 million in damages. Equally astonishing is the arbitrator's award in favor of Pure against NVID for $14 million plus voiding Pure's contractual obligation to pay NVID at least $1 million per year as a royalty. One is reminded of the children's saying, "Sticks and stones will break my bones,

7

but names will never hurt me." Apparently, according to Arbitrator

Fitzmaurice, by neither sticks nor stones but only names Pure was hurt in

excess of $3 million. Falken believes that this award on these facts

exceeded the arbitrator's power and so imperfected it that a mutual, final,

and definite award upon the subject matter submitted was not made.

13. Pure made no inquiry to Falken about whether Falken would pay its share

of the costs for a reasoned award. Pure, believing that it had won the

arbitration, did not want a reasoned award, as a reasoned award could

make it easier for Falken to attack.

14. The Exhibits attached to the motion are true and correct copies of

pleadings filed in the Pure/Falken and Nickel litigations.

By _____

Michael J. Rovell

Dated: March 27, 2006

8

# EXHIBIT 1

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

NICKEL, LTD., and FALKEN
INDUSTRIES, LTD., New Jersey
Corporations,

Petitioners,

v

PURE BIOSCIENCE, f/k/a Innovative
Medical Services, a California
Corporation,

Respondent.

Case No. 04CV 2248 L (NLS)

**DECLARATION OF
MICHAEL J. ROVELL**

Date:   March 20, 2006
Time:   10:30 a.m.
Court:  14

JUDGE M. JAMES LORENZ, presiding

Michael J. Rovell declares under penalties of perjury as follows:

1.      I am an attorney licensed to practice law since 1972 and have acted as lead lawyer

in the various litigated matters involving Pure Bioscience on one hand and Nickel,

Ltd. and/or Falken on the other.

2.      I began performing legal services for Nickel and Falken in 2003.  I met the Nickel

and Falken principals for the first time in Paris in October 2003 where I was

ultimately retained to prosecute a claim against Pure pursuant to the provisions of

the dispute resolution set forth in the Umbrella Agreement, which will require the

matter to be arbitrated in Stockholm, Sweden.

3.      After I returned from Paris, I learned of the existence of a claim filed by Pure

against Falken, Nickel, NVID, and various other individuals including the

1

directors of NVID.  I was retained to represent all defendants in connection with that arbitral claim.

4.  That claim was not a new arbitration, but an outgrowth of an earlier arbitration and settlement in which the parties agreed that future disputes would be arbitrated by the arbitrator who presided over the original settlement involving NVID and Pure. At the time of that settlement agreement, which has commonly been referred to as the Core Settlement Agreement, Falken was not in existence and there had been no contacts between any of the parties with each other or Pure.

5.  As a result of motion practice before Arbitrator Fitzmaurice, Nickel and the various individuals were dismissed.  However, Falken remained in the arbitrator's view, the proper party to the arbitration proceeding.  Falken in participating in the motion practice before the arbitrator, specifically reserved its rights to contend that it was not a party to the arbitration agreement and that it was not waiving any claim to jurisdiction by participating in the motion practice.  That understanding is explicitly confirmed by the arbitrator.

6.  After the arbitrator ruled against Falken, it still however, remained Falken's position that it was not subject to the arbitration provision.  It appeared to Falken that the arbitrator was prepared to enter a default against Falken as a result of its refusal to further participate in the arbitration.  Falken's position was that it was not required to participate, notwithstanding the arbitrator's view to the contrary as only a court can bind a non-signator to an arbitration agreement.

7.  As a result, Falken, at my direction, filed suit in the United States District Court

for the Southern District of New York, to enjoin both Pure and the American

Arbitration Association from entering any default against Falken until a judicial

determination could be made that Falken was a proper party to the arbitration. A

telephonic status and settlement conference occurred between the parties and the

district court judge, which ended up in a settlement of Falken's lawsuit. Pursuant

to the settlement, a stipulation was entered that no default could be entered against

Falken until after a judicial determination could be made that Falken was a proper

party to the arbitration. As part of the agreement, Pure undertook the obligation to

file a lawsuit to compel Falken to arbitrate.

8.    A few months thereafter, Pure filed case number 05 CV ~~2299~~ 2020 fL, seeking to compel

Falken to arbitrate. The parties filed extensive briefs on the question of whether

Falken should be compelled to arbitrate.

9.    During the pendency of those proceedings, Pure moved to bifurcate NVID from

Falken. As stated earlier, I had previously been retained to represent NVID.

10.    The NVID directors, for their own purposes, resigned en mass. The last act prior

to their resignation was to terminate my services as NVID's lawyer.

11.    The Pure and NVID arbitration proceeded to a hearing, in which NVID did not

participate and was defaulted. Falken did not participate, as to do so would have

voided Falken's claim that it was not a proper party to the arbitration and probably

would have mooted the then pending litigation before this Court.

12.    Notwithstanding the fact that Falken did not participate and that there was a

stipulation which led Falken to the belief that it was protected from having to

3

participate, the arbitrator entered a reasoned award against NVID for

approximately $14 million and made a finding that there was a de facto merger

between NVID and Falken.

13. In January, 2005, this Court entered its order compelling Falken to arbitrate and

Falken filed a timely notice of appeal.

14. The Pure - Falken arbitration proceeded to a hearing, which lasted approximately

eight full trial days. As a result of that hearing, an unreasoned damage award was

entered against Falken and with attorney's fees, amounted to approximately $3.4

million. Falken had requested that whatever award he entered be a reasoned

award. Pure objected and the American Arbitration Association upheld Pure's

objection because the parties had not requested a reasoned award at the outset of

the arbitration and an individual party could not, in the view of the American

Arbitration Association, unilaterally require the arbitrator to make a reasoned

award. At the time, Falken noted its objection to the ruling of the American

Arbitration Association and pointed out that if it applied the rule consistently, then

the NVID award should not have been a reasoned award because the parties did

not request it at the inception and none of the respondents had agreed to a

reasoned award thereafter.

15. While these matters were being litigated, which had been commonly referred to in

these proceedings as Arb 1 and Arb 1.5, Pure filed a second claim in arbitration

against Nickel and Falken, commonly referred to as Arb 2. Nickel and Falken

filed a declaratory action in this Court that Pure could not proceed in arbitration in

4

San Diego because the Umbrella Agreement provided at Section 10.21 that all disputes arising under the Agreement had to be litigated in Stockholm, Sweden and each party was specifically covenanted that it would not bring suit in their respective jurisdiction against the opposite party.  See Sections 10.19 and 10.21.  Pure counterclaimed requesting an order compelling Nickel to arbitrate.  The arbitrator who had been appointed, Mr. L'Estrange, agreed to stay the arbitration while Pure's Motion to Compel was pending.  After this Court granted Pure's Motion to Compel Nickel to Arbitrate, the arbitral proceedings recommenced.

16.   As no Motion to Compel Falken had been made, Pure acquiesced in Falken's objection to participating in the arbitration proceeding without being compelled to do so and voluntarily dismissed Falken from its arbitral claim.  Thereafter, on December 16, 2005, Pure filed a federal lawsuit against Falken concerning the matters which it had sought to arbitrate in Arb 2.

17.   Nickel filed a timely notice of appeal and its appeal in this Court's holding compelling Nickel to arbitrate is currently pending.

18.   Nickel, on its part, filed claims in France against Pure under the separate and distinct Super Distribution Agreements.  This Court found that the filings of these claims by Nickel estopped Nickel from asserting that the Licensing Agreement was not a stand alone agreement.  September 30, 2005 Order at 9.

19.   In December 2005, Nickel recommenced its Swedish arbitration efforts against Pure, which is now commonly referred to as Arb 3.  Back in 2003, an attempt was made to initiate the arbitration process by naming Alexis Maitland-Hudson as

5

claimant's arbitrator. Pure objected to Mr. Hudson being an arbitrator because he was listed as "of counsel" to the undersigned's law firm and more importantly, in Pure's view, arbitration could only be initiated through the American Arbitration Association. Nickel had no ability to compel Pure to arbitrate unless it filed its claim with the American Arbitration Association. Nickel's position had been that the arbitration provision provided that the rules of the American Arbitration Association would be utilized, which is different than having the case administered by the American Arbitration Association, which expense was too costly for Nickel to bear.

20.    What began as a single arbitration has mushroomed into three federal lawsuits, two appeals, and three arbitrations. The legal costs in terms of fees of coordinating all these matters is enormous. This does not include the lawsuits in France, which the undersigned has no responsibility for.

21.    Pure has at least one full time lawyer, Charles Brumfield, on salary plus a paralegal, Jeff Kitchell. In their application for attorney's fees in Arb 1.5, they estimated that together they spent approximately 800 hours on this matter. Brumfield Declaration of September 20, 2005 at paragraph 4, a copy of which is attached as Exhibit 1. In addition, Pure utilized the services of Wolfgang Hahn, who billed them $133,133.00, whose hourly rate is approximately one-half that of the undersigned counsel. That time is only through the arbitral hearings in August and does not include any of the work that has been performed subsequent in either the district court, Court of Appeals, or in Arb 2.

22.    Falken is an extremely small company and Nickel is no longer an operating

business.  Its resources are extremely limited.

23.    Currently, both Falken and Nickel owe substantial past due legal fees to the

undersigned which in the aggregate exceed at last review $200,000.00.  Payments

by Falken and or Nickel have been sporadic at best.  Undoubtedly, it is a material

element of Pure's strategy to crush both of these small companies by the weight of

the legal cost engendered by a multiplicity of duplicative or unjustified litigation.

It is not reasonable for Nickel to expect that undersigned to continue all these

litigated matters without receiving substantial payment.  For example, this entire

week has been devoted to the Motion to Reconsider in the Ninth Circuit, the

Reply to the Motion for Stay, work on the Reply Memorandum in support of the

Motion to Vacate the first award, and Response to Pure's Motion to Compel

before the Arbitrator.  Nickel has agreed to pay at least $10,000.00 per month

beginning in 2006, but it is still delinquent on February's payment and no

payment has been made for March.  In addition, Mr. Seidel is also owed money,

so that it is not reasonable to expect that he would increase his participation

without there being a substantial payment to cover both arrearages and future

work.

24.    Undersigned counsel had previously estimated that the cost directly associated for

the arbitration hearing would be $125,000.00.  While Pure disputes this estimate,

in doing so Pure vastly understates the cost per day and the number of days the

hearing will last with the attendant preparation.  The last hearing lasted a full eight

7

trial days. Falken put on two witnesses in its own defense, taking up less than one day. In Mr. Brumfield's declaration (paragraph 17), he indicates that from their perspective, the hearing will be a repeat of the evidence submitted in Arb 1 and Arb 1.5, "fine tuned to address issues specific to the Axen License Agreement" and trade libel evidence will virtually be the same. The issues as they currently stand, subject to Nickel's Motion to Stay and/or Sever, the counts are substantially broader than both Arb 1 and Arb 1.5, if for no other reason, it includes alleged further evidence of trade libel and a claim that Pure was fraudulently induced into entering into the unsigned Axen Licensing Agreement. Moreover, if the hearing were to proceed, Nickel anticipates the defendant's case will take longer to present.

25.    At Arb 1.5, Pure's Chief Executive Officer testified as to a series of corporate opportunities, which were allegedly lost as a result of the trade libel. If the hearing proceeds, subpoenas will be issued for these company's records and at least one of them is within the subpoena power of the arbitrator, and we would anticipate live testimony from that witness. At Arb 1.5, Falken did not retain an expert. For Arb 2, Nickel intends to attempt to retain an expert, even though it is reasonably anticipated that the costs of an expert would be in excess of $20,000.00

26.    The reason that more effort would be undertaken in Arb 2 as opposed to Arb 1.5 is that the result in Arb 2 is not in my view preordained as it was in 1.5. Having made the finding that a de facto merger occurred between NVID and Falken and

having stated prior to and during the hearing that the arbitrator believed that finding to be both correct and binding, the best I believed that Falken could hope for at the arbitral hearing was to reduce the $14 million award that had been entered in its absence.

27.    There is still a great deal of work to be performed as it relates to the arbitration hearing. There will be a hearing on Pure's Motion to Compel regarding its document request. There will be a hearing on Pure's Motion to Compel Documents relating to the French judgments. There will be hearings on Nickel's Motion to Stay and/or Sever and it is anticipated that there may be summary judgment like motions as it relates to Nickel's affirmative defenses. We are still awaiting and will have to review Pure's production of documents. We have to retain and prepare an expert. We have to trade exhibits and write pretrial briefs. All of this must be done before April 10th.

28.    In addition, in order to properly prepare even some semblance of a defense, the undersigned counsel will have to travel to Paris to meet with Mr. Gouiran and/or any other Nickel representatives.   As Mr. Gouiran is unable to travel to the United States, his testimony will either have to be taken telephonically at the hearing or received by way of a deposition. The travel costs plus time to go to Paris and back are very substantial. Unfortunately, Nickel to the extent that it is located anywhere, it is located in France, the undersigned will have to go there rather than have Nickel travel to the United States.

29.    Nickel did not litigate whether Pure's claims fell within the Licensing Agreement

9

as it was Nickel's position that they had not agreed to arbitrate any claims in the United States. Pure has taken the position before the arbitrator that this Court's order compelling Nickel to arbitrate is res judicata on the arbitrator as to the scope of the arbitration.

30.     Further, the undersigned respectfully submits that the scope of the hearing is substantially broader than the court envisioned when it compelled arbitration. Mr. Auerbach, in his declaration page 16, paragraph 31, stated, "In mid-2004, I and Mike Krall requested that our legal department commence AAA arbitration regarding breaches of Nickel, specifically related to the Axen License Agreement. I personally asked our counsel to include therein <u>only those claims which fit narrowly under the terms of the Axen License Agreement</u>. Examples follow which illustrate that our claim directly track the Axen License Agreement" (Emphasis in the original). The two examples set forth clearly fit Mr. Auerbach's description. The remainder of the claims do not. In granting Nickel's Motion to Compel, this Court assumed that the claims being made fit within the narrow scope of the Licensing Agreement rather than the Umbrella Agreement. See Order at 9.

31.     For purposes of estimating the costs of Arb 2, I have used the number of hours from Arb 1.5 (118) and assume that for every hour spent at the actual hearing and preparation for hearing, one half hour remains to be spent. That number is probably low, as Mr. Hahn spent 104.8 hours at the last hearing and he was absent from the hearing approximately 30 percent of the time. Using that assumption, I

10

would estimate 177 hours of time between now and the conclusion of the hearing. At my hourly rate of $495 per hour, that would amount to $87,615.00. In addition, I am going to need to have an associate with me at the hearing. Assuming she spends 90 hours at the hearing and in preparation thereof at $150 per hour, the cost for her time will be approximately $13,500.00. Travel and lodging in San Diego will easily be in excess of $3,500.00. Travel to and from Paris plus lodging would conservatively be $5,000.00. Retention of an expert would cost at least $20,000.00. The total for these charges is estimated to be approximately $130,000.00.

32.  As shown above, out of economic necessity, Nickel would be better served to simply default at the arbitral hearing and use whatever resources it has at its disposal to litigate its appeal from this Court's order. This is a choice which is unfair for Nickel to have to make under the circumstances of this case.

33.  As a result of Nickel and Falken's limited financial means, legal services provided have to be tailored to take into account the economic realities. While Pure has the extreme advantage of having full time staff lawyers, Nickel and Falken do not, so that the amount of time that can be spent on Nickel/Falken matters is limited. Undersigned cannot devote his entire practice to these claims in the manner of Mr. Brumfield has been able to devote his practice to Pure, as he unlike undersigned counsel, is an employee.

34.  Unfortunately because of the economic realities, it is not possible for Nickel to undertake the expense of seeking an expedited appeal because it did not have the

11

resources to pay for it. Nickel and Falken do not have the resources to pay for

additional counsel to assist the undersigned in this matter and Nickel is currently

owing a fee to Mr. Seidel, who has functioned as counsel of record before this

Court. While the undersigned counsel has valiantly tried to keep up the task, it is

impossible, especially in lieu of recent health problems that have required two

separate hospitalizations so far this year. In large measure, undersigned counsel

finds himself in the same predicament as the little Dutch boy tasked with filling

holes in the dyke with only his fingers.

By _____
Michael J. Rovell

Law Offices of Michael J. Rovell, Chtd.
20 N. Clark Street, Suite 2450
Chicago, IL 60602
Tel: (312) 578-9191
Fax: (312) 578-9391

# EXHIBIT 2

☒ FILED            ___ LODGED
___ RECEIVED       ___ COPY

APR 0 9 2004

CLERK U D DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ DEPUTY

1   Dennis B. Atchley, SBN 70036
    402 North Nevada Street
2   Oceanside, CA 92054
    (760) 400-0263
3

4   Attorneys for Defendants

5

6

7              IN THE UNITED STATES DISTRICT COURT

8                  FOR THE DISTRICT OF ARIZONA

9

10  CHARLES L. SIDDLE, as Trustee of          Case No.: CV - 03 2563 PHX PGR
    COLT COMMUNICATIONS MONEY
11  PURCHASE PENSION PLAN; COLT               **DECLARATION OF GENE AUERBACH IN**
    COMMUNICATIONS MONEY PURCHASE
12  PENSION PLAN; LEE ANN NEWCOMB,            **OPPOSITION TO PLAINTIFFS' MOTION**
    as Trustee for SPS BUSINESS
13  SERVICES, INC. 401(k) PROFIT                  **FOR SUMMARY JUDGMENT**
    SHARING PLAN formerly known as
14  SPS BUSINESS SERVICES, INC.
    MONEY PURCHASE PENSION PLAN; SPS
15  BUSINESS SERVICES, INC. 401 (K)
    PROFIT SHARING PLAN formerly
16  known as SPS BUSINESS SERVICES,
    INC. MONEY PURCHASE PENSION
17  PLAN;
18
19  Plaintiffs,
20       vs.
21  PURE BIOSCIENCE, a California
    corporation, formerly known as
22  INNOVATIVE MEDICAL SERVICES, a
    California Corporation;
23  Defendant.
24

25

26  I, Gene Auerbach, declare:

27  1.  That I am the Chief Operating Officer  of  PURE  BIOSCIENCE

28  (PURE) formerly INNOVATIVE MEDICAL SERVICES (IMS) and have been

                                    1

                          **ORIGINAL**

1  since June 2002. This declaration is submitted in opposition to
2  Plaintiffs' Motion for Summary Judgment. All of the information
3  contained herein is true and correct, is within my personal
4  knowledge and, if called upon to testify, I could and would
5  competently testify hereto. .

6

7  2. As the COO, my focus during calendar year 2002 and 2003 was
8  on quickly bringing to market our new biotech disinfectant and
9  pesticide technologies.  Part of the agreement with Mr. Siddle,
10 the so called consulting agreements, was that he would
11 aggressively introduce us to various contacts who he postured,
12 from his "Young President's Organization (YPO)", could
13 immediately recognize the value of the biotech products and
14 quickly take the potential products to market. He stated he had
15 a YPO book of "movers and shakers" who would gladly help out.
16 Numerous conversations were initiated by Mike and me to gain the
17 contacts.  Mr. Siddle refused to permit us to look at the "book"
18 to identify individuals and companies in market spaces that
19 could help us.

20

21 3. Under pressure, Mr. Siddle finally held a conference call
22 with Mike and me in which we told him that we were interested in
23 contacts he may have in the areas of cosmetics, poultry/poultry
24 processing, industrial fruit and vegetable washes, consumer
25 products and water cleaning.  As a result he discussed two meat
26 companies without providing introductions, one poultry company
27 in Taiwan whom he provided phone numbers, but no introduction,
28 and one hospital contact whom we already knew.  We did work for

2

1   a while testing the disinfectant with the hospital contact, but
2   then Mr. Siddle basically terminated any continued effort to
3   assist the company by way of consultation.  Lee Ann Newcomb
4   never provided any consultation services whatsoever under the
5   consulting agreement with SPS, LLC. For this extraordinary
6   limited and wholly ineffective consultation, our accounting
7   records indicate that Mr. Siddle and Ms. Newcomb received
8   consulting consideration exceeding a quarter of a million
9   dollars.

10

11  4. In my total business experience as an senior executive in
12  several billion-dollar retail and consumer product companies, I
13  have never seen a consulting agreement where the consideration
14  provided was so disproportionately high in comparison to effort
15  provided and results obtained.  The relationship regarding
16  consulting agreements clearly was not reasonable or commensurate
17  with services provided.

18

19  5. Further, I would characterize every interaction with Mr.
20  Siddle as difficult.  He appeared to have nothing else to do
21  daily and would continually call Mike to posture and gain
22  insider information and then try to utilize the information to
23  enhance his position.  He never seemed to try to assist IMS as
24  the company worked hard trying to enhance its revenue stream.
25  It appeared that the more knowledge Mr. Siddle gathered, the
26  more he tried to increase or leverage his position with the
27  company.  From my viewpoint, it appeared he was actually trying

28

1  to limit company success while at the same time positioning
2  himself to be able to take over the company cheaply.

3

4  I declare under penalty of perjury under the laws of the United
5  States of America that my statements above are true and correct.
6  This declaration was penned on the 8th day of April 2004 at 1725
7  Gillespie Way, El Cajon, California 92020.

8

9

10

11                    Gene Auerbach

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mar 27 2006 11:29AM   LAW OFFICES                    3125789391                    p.7

# EXHIBIT 3

1  Dennis B. Atchley, SBN 70036
   402 North Nevada Street
2  Oceanside, CA 92054
   (760) 400-0263
3

4  Attorneys for Defendants

5



6

7              IN THE UNITED STATES DISTRICT COURT

8              FOR THE DISTRICT OF ARIZONA

9

10 CHARLES L. SIDDLE, as Trustee of    Case No.: CV - 03 2563 PHX PGR
   COLT COMMUNICATIONS MONEY
11 PURCHASE PENSION PLAN; COLT          **DECLARATION OF MICHAEL L. KRALL**
   COMMUNICATIONS MONEY PURCHASE
12 PENSION PLAN; LEE ANN NEWCOMB,       **IN OPPOSITION TO PLAINTIFFS'**
   as Trustee for SPS BUSINESS
13 SERVICES, INC. 401(k) PROFIT         **MOTION FOR SUMMARY JUDGMENT**
   SHARING PLAN formerly known as
14 SPS BUSINESS SERVICES, INC.
   MONEY PURCHASE PENSION PLAN; SPS
15 BUSINESS SERVICES, INC. 401 (K)
   PROFIT SHARING PLAN formerly
16 known as SPS BUSINESS SERVICES,
   INC. MONEY PURCHASE PENSION
17 PLAN;

18

19 Plaintiffs,

20     vs.

21 PURE BIOSCIENCE, a California
   corporation, formerly known as
22 INNOVATIVE MEDICAL SERVICES, a
   California Corporation;                     **ORIGINAL**
23 Defendant.

24

25

26 I, Michael L. Krall, declare:

27 1. That I am the President and Chief Executive Officer of PURE

28 BIOSCIENCE (PURE) formerly INNOVATIVE MEDICAL SERVICES (IMS) and

   have been since 1992. This declaration is submitted in

   opposition to Plaintiffs' Motion for Summary Judgment. All of

                                1

1   the information contained herein is true and correct, is within
2   my personal knowledge and, if called upon to testify, I could
3   and would competently testify hereto.

5   2. As the President/CEO of a public company, one of my primary
6   responsibilities is to seek and obtain capital for the expansion
7   and growth of my company.   In the summer of 2001, I was
8   investigating   short   and   long-term   financing   opportunities,
9   focusing on private sales of common stock.

11  3. In August 2001, I was introduced telephonically to CHARLIE
12  SIDDLE as a potential source of capital.   After a brief
13  discussion, we agreed to a face-to-face meeting at the Phoenix
14  airport on August 30, 2001.

16  4. During our discussion, Mr. SIDDLE offered a line of credit
17  arrangement which was interesting to me only as a "safety net"
18  plan for corporate finance.

20  5. Subsequent to our Phoenix meeting, Mr. SIDDLE presented a
21  term sheet for the line of credit.   Although I planned to
22  continue my efforts to raise capital by selling stock, and
23  although SIDDLE's proposal was expensive when compared with
24  standard industry rates, I believed that a line of credit as a
25  "safety net" was a useful layer of corporate finance.

27  6. In addition to presenting the financing opportunity, Mr.
28  SIDDLE boasted that because of his involvement with the Young
    Presidents Organization (YPO), he was confident that his
    influence with his peers in YPO would result in significant

                                    2

1  investment in my company by YPO presidents and CEOs as well as
2  significant revenue-generating business.   Mr.   SIDDLE also
3  offered to provide the contact information contained in his YPO
4  membership directory for me to use as a lead sheet.  Mr. SIDDLE
5  further represented that he would arrange personal meetings with
6  any president in the directory at my request, and that YPO
7  presidents were bound by "the code" to take his call and meet
8  with him and me within 24 hours.

9

10  7. Based on my belief that Mr. SIDDLE's financing arrangement
11  was a useful "safety net" for my company, but more so because I
12  believed Mr. SIDDLE would make introductions to presidents and
13  CEO's of potentially hundreds of companies which could result in
14  significant revenues for IMS, I entertained SIDDLE's proposal.
15  We began document preparation during the first week in September
16  2001.

17

18  8. Consulting agreements are necessary in the ordinary course of
19  business. The typical method whereby PURE BIOSCIENCE retains and
20  compensates its consultants who arrange capital is by retaining
21  them for one year and agreeing to compensate them based on a
22  percentage of the capital they arrange.   Based on the gross
23  proceeds, the cash compensation typically ranges from five to
24  ten percent. In addition to cash compensation for services, we
25  may negotiate up to ten percent of the proceeds arranged in an
26  equal value of warrants or options.

27

28  9. In the case of marketing consulting, consultants are also
retained for one year and typically earn between five and ten
percent of gross revenues generated by their efforts.

1

10. After the tragedy of September 11, 2001, as the financial markets fell into disarray, it became clear that IMS would be unable to raise money through sales of stock as we had planned. I had been negotiating with SIDDLE thinking that his deal was a "B Plan" for the Company, but following September 11th, SIDDLE's proposal became the "A Plan" by default. I attempted to negotiate more reasonable terms, but Mr. SIDDLE maintained a hard line "my way or the highway" position. In light of 9/11 and the uncertainty of future stock market conditions, I reluctantly chose to acquiesce to SIDDLE's terms and execute the final loan documents and consulting agreements with COLT COMMUNICATIONS, LLC, SPS, LLC, SIDDLE and NEWCOMB.

11. I executed the First Consulting Agreements for Capital Formation between INNOVATIVE MEDICAL SERVICES and COLT COMMUNICATIONS, LLC and INNOVATIVE MEDICAL SERVICES and SPS, LLC on behalf of the Corporation on September 13th, 2001. The Consulting Agreements each called for monthly payments in the amount of 2½% of the total of any or all financing arranged or provided by COLT COMMUNICATIONS and SPS, LLC to be paid to them. True and correct copies of those Agreements are lodged herewith as Exhibits "1" and "2."

12. Also in early September 2001 CHARLES SIDDLE and I discussed an arrangement whereby SPS and COLT COMMUNICATIONS would be paid additional consulting fees for capital formation consulting in options to acquire common stock of the Corporation. Pursuant to this arrangement, both CHARLES SIDDLE and LEE ANN NEWCOMB were each granted options to purchase 25,000 shares of INNOVATIVE

1   MEDICAL SERVICES stock at $2.75 per share. As an additional

2   requirement to obtain the line of credit, I executed those

3   contracts on September 13, 2001. Said option agreements are

4   lodged herewith and marked Exhibits "6" and "7." Neither ever

5   exercised these options.

6

7   13. At the same time, we executed a promissory note in the

8   amount of $500,000.00 (lodged herewith as Exhibit "4") at 12%

9   interest per annum in favor of SPS, LLC. Lodged as Exhibit "3"

10  is the Security Agreement between INNOVATIVE MEDICAL SERVICES

11  and SPS, LLC. Lodged herewith as Exhibit "5" is a true and

12  correct copy of the Assignment of Accounts Receivable dated 9-

13  13-01.

14

15  14. On September 17, 2001 IMS drew down the first $100,000 from

16  the line of credit, and by March 20, 2002, the Corporation drew

17  the entire $500,000, as is accurately set forth on Column B on

18  Exhibit "A" to the declaration of the Corporation's Chief

19  Financial Officer, Gary Brownell. Concurrently, it made the 12%

20  interest payments and payments of 2½% per month on the unpaid

21  balance to SPS and COLT COMMUNICATIONS. The total of all

22  payments made to SPS at the 12% rate of interest is $49,023.74

23  plus one late fee of $38.76 for a total of interest and late

24  fees paid to SPS of $49,062.50.

25

26  15. In May of 2002, SIDDLE informed me that INNOVATIVE MEDICAL

27  SERVICES was in default on the First Loan Agreement, and that he

28  would immediately declare the entire sum due and payable if we

    would not re-price his and Ms. NEWCOMB'S options. With no means

    of immediate payment the options were re-priced at $1.47 per

1  share, with SIDDLE being granted options to purchase 85,000
2  shares at this price and NEWCOMB being granted options to
3  purchase 50,000 shares at the same price. Neither party ever
4  exercised these options. In support of the option re-pricing, on
5  May 24th, 2002, two new Consulting Agreements for Capital
6  Formation were executed between INNOVATIVE MEDICAL SERVICES and
7  COLT COMMUNICATIONS, LLC and SPS, LLC whereby SPS and COLT
8  COMMUNICATIONS were each to be paid 2 ½% per month on the
9  balance of any and all financing arranged or provided by them.
10 Lodged herewith as Exhibits "8" and "9" are the Consulting
11 Agreements with COLT COMMUNICATIONS, LLC and SPS, LLC. Lodged
12 as Exhibits "10" and "11" are the option agreements for SIDDLE
13 and NEWCOMB, respectively.

14

15 16. In July of 2002, IMS was again informed by SIDDLE that it
16 was in default of its obligations under the First Loan
17 Agreement, and he again threatened to declare the entire sum due
18 and payable if we would not re-price his and NEWCOMB'S options.
19 With no means of immediate payment, the options were re-priced
20 at $0.57 per share, with SIDDLE being granted options to
21 purchase 85,000 shares at this price and LEE ANN NEWCOMB being
22 granted options to purchase 50,000 shares at the same price.
23 Said option agreements are lodged herewith as Exhibits "12" and
24 "13." Again, in support of the option re-pricing, on July 30,
25 2002, two new Consulting Agreements for Capital Formation were
26 executed between INNOVATIVE MEDICAL SERVICES and COLT
27 COMMUNICATIONS, LLC and SPS, LLC whereby COLT COMMUNICATIONS and
28 SPS were each to be paid 2 ½% per month on the balance of any
   and all financing arranged or provided by them. These

1   Consulting Agreements are lodged herewith as Exhibits "14" and

2   "15."

3

4   17. In September of 2002 SIDDLE once again informed us that IMS

5   was in default of its obligations under the First Loan

6   Agreement, and he again threatened to declare the entire sum due

7   and payable if we would not provide additional consideration to

8   him and his associates. As a result, the Corporation then

9   entered into an additional Consulting Agreement, this time for

10  Marketing and Business Development (a copy of which is lodged

11  herewith as Exhibit "16") whereby 65,000 shares of stock valued

12  at $45,500 were delivered to COLT COMMUNICATION, LLC, and it was

13  also agreed that a commission would be determined on marketing

14  and business development transactions on a case by case basis.

15

16  18. Also in September of 2002, SIDDLE submitted to us a

17  Memorandum of Understanding whereby SIDDLE and NEWCOMB agreed to

18  exercise their options to purchase stock, and IMS agreed to

19  apply the proceeds of the exercise price to three months of

20  consulting fees due SIDDLE and NEWCOMB in the amount of $75,000

21  by September 17, 2002. Lodged herewith as Exhibit "17" is the

22  Memorandum of Understanding which was executed on September 13,

23  2002. The transaction resulted in the issuance of 85,000 shares

24  of IMS stock to SIDDLE and 50,000 shares of IMS stock to

25  NEWCOMB. In addition, IMS recognized an expense of $59,805 for

26  these options issued and exercised in September 2001.

27

28  19. Pursuant to the financial Consulting Agreements with SPS and

    COLT COMMUNICATIONS, SPS was paid a total of $72,559.36 and COLT

    COMUNICATIONS was paid a total of $47,976.03.

Mar 27 2006 11:34AM   LAW OFFICES                    3125789391              P.15

20.   In the year between 9-17-01 and 10-17-02, the total of
interest payments paid on the Promissory Note was $169,597.89.

21.  During  that  same  period,  in  lieu  of  cash  payments  of
$100,000 in interest due on the Promissory note and fees payable
for financial consulting,  IMS issued 200,000 shares of common
stock valued at $140,000 to COLT COMMUNICATIONS, LLC.

22. As a result of these transactions, CHARLES SIDDLE personally
owned 350,000 shares of IMS stock, and LEE ANN NEWCOMB owned
50,000 shares of common stock, which, at that time, together
comprised approximately 5% ownership of IMS.

23. At the time I entered into each of the referenced consulting
agreements,  it was my expectation that Mr. SIDDLE and Ms.
NEWCOMB would actively work to arrange introductions to and
meetings  with  potential  accredited  investors,  financial
institutions and qualified potential customers.  Although on
March 13, 2002, Mr. SIDDLE did arrange for my attendance as his
guest at a Young Presidents Organization function, this meeting
resulted in neither additional financing nor product sales.

24. On numerous occasions, Mr. SIDDLE promised lists of names
and phone numbers for qualified investors or customers from his
YPO database, but his promises never materialized.

25. Beginning in August 2002, SIDDLE called me numerous times
wanting to know if we intended to pay off the line of credit or
modify the loan.

8.

26. We began to negotiate modifications to the loan, and SIDDLE compelled us to a) leave the original loan transaction intact, including related collateral agreements, b) leave the UCC-1 intact evidencing the original loan transaction, c) at our own expense remove the restrictive legend from the stock of SIDDLE and NEWCOMB at an accelerated rate, which would allow them to further profit by selling the stock acquired earlier through our various transactions.

27. Also, as a condition of the purported loan modification, SIDDLE required the execution of a release in favor of himself and Ms. NEWCOMB individually or as trustees or officers of the affiliated entities (See Exhibit "A" to Plaintiffs' complaint and Paragraph II.8.)

28.  In addition, SIDDLE required me, at our expense, to allow LEE ANN NEWCOMB, and their attorney, Ernie Recseter, access to all IMS corporate and financial records to conduct on site due diligence.  On October 9, 2002 NEWCOMB and Recseter came to our office and reviewed and received documents that we produced at their request.

29. SIDDLE demanded that I accompany NEWCOMB and Recseter back to Arizona in order to sign the loan modification documents *in Arizona*.  At our expense, I flew to Arizona with NEWCOMB and Recseter on October 9, 2002 and executed the loan modification documents at the airport ticket counter.

1  30. SPS, LLC not only refused to withdraw the UCC-1 filed for

2  the first loan, but also on or about October 11, 2002 COLT

3  COMMUNICATIONS MONEY PURCHASE PENSION PLAN and SPS BUSINESS

4  SERVICES, INC. 401(K) PROFIT SHARING each proceeded to file

5  additional UCC-1 forms.

6

7  31. At no time did SPS, LLC provide IMS with a cancelled

8  promissory note evidencing that it had been paid in full. At no

9  time did SIDDLE provide IMS with $600,000 as consideration for

10  the second loan agreement. We received only $100,000: a check

11  on October 9, 2002 and a wire transfer on October 16, 2002.

12

13  32. As a result of Mr. SIDDLE's and Ms. NEWCOMB's various

14  agreements with IMS, they and their entities have received

15  $169,597.89 in interest payments on the first loan, $122,500.00

16  in interest payments on the second loan, and shares of the

17  Company costing $245,305.00, for total consideration of

18  $537,402.89. They jointly own over 400,000 shares of IMS stock.

19  And now they claim that IMS owes them an additional amount

20  exceeding $650,000.

21

22  I declare under penalty of perjury that the foregoing is true

23  and correct and that this declaration was executed this 8th day

24  of April, 2004 at El Cajon California.

25

26  DATED: April 8th, 2004

                           Michael L. Krall

27

28